# EXHIBIT 8

Nos. 24-820, 24-860

IN THE

# Supreme Court of the United States

DANIEL RUTHERFORD,

*Petitioner,*

v.

UNITED STATES,

*Respondent.*

JOHNNIE MARKEL CARTER,

*Petitioner,*

v.

UNITED STATES,

*Respondent.*

On Writ of Certiorari to the United States Court of Appeals for the Third Circuit

## BRIEF OF AMICI CURIAE FORMER CORRECTIONS OFFICIALS IN SUPPORT OF PETITIONERS

SCOTT P. LEWIS
  *Counsel of Record*
TAMARA S. WOLFSON
AUSTIN P. ANDERSON
PAUL M. KOMINERS

ANDERSON & KREIGER LLP
50 Milk Street, 21st Floor
Boston, Massachusetts 02109
(617) 621-6500
lewis@andersonkreiger.com

*Counsel for Amici Curiae*

August 14, 2025

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................ ii

INTEREST OF AMICI CURIAE ................................ 1

SUMMARY OF THE ARGUMENT AND INTRODUCTION..................................................... 4

ARGUMENT ............................................................ 5

   I.   Expanding access to compassionate release for inmates serving unusually long sentences would benefit BOP............................................ 5

  II.   Medical care is just one of the multiple intersecting crises facing BOP. ...................... 14

CONCLUSION ......................................................... 18

ii

# TABLE OF AUTHORITIES

**Cases**

*Concepcion v. United States*, 597 U.S. 481 (2022) ...14

**Statutes**

18 U.S.C. § 3582(c)(1)(A)(i) ...................................4, 14

28 U.S.C.A. § 994(t)...................................................14

One Big Beautiful Bill, Pub. L. No. 119-21 .............16

Pub. L. No. 118-71, 138 Stat. 1492 (2024)...............17

U.S.S.G. § 1B1.13(b)(1) .......................................13, 14

U.S.S.G. § 1B1.13(b)(6) ....................................4, 5, 14

**Regulations**

88 Fed. Reg. 7180 ....................................................14

88 Fed. Reg. 28254 ..................................................14

88 Fed. Reg. 28256 ..................................................14

**Legislative Materials**

Committee on Appropriations, 117th Cong., Joint
    Explanatory Statement of Public Law 117-328
    (2023) ...................................................................17

*Containing Health Care Costs for an Increasing
    Inmate Population, Testimony Before the Subcomm.
    on Criminal Justice Oversight*, 106th Cong. (Apr. 6,
    2000) .......................................................................5

Government Accountability Office, *Better Planning
    and Evaluation Needed to Understand and Control
    Rising Inmate Health Care Costs* (2017)................6

iii

Government Accountability Office, *GAO-23-106203: High-Risk Series* (Apr. 20, 2023) ...........................17

Michael E. Horowitz, Inspector General, DOJ, Statement Before the U.S. Sentencing Commission Hearing on "Compassionate Release and the Conditions of Supervision" (Feb. 17, 2016) ...........6

*Oversight of the Federal Bureau of Prisons: Hearing Before the Subcomm. on Crime & Fed. Gov't Surveillance of the H. Comm. on the Judiciary*, 118th Cong. (July 23, 2024) ........................7, 16, 17

*Oversight of the Federal Bureau of Prisons: Hearing Before the Subcomm. on Crime & Fed. Gov't Surveillance of the H. Comm. on the Judiciary*, 118th Cong. (Nov. 7, 2023) ..........................7, 16, 17

**Administrative Materials**

Bureau of Prisons, *Federal Prison System Population Actuals* (downloaded Feb. 20, 2025) ........................6

Jefferson Consulting Grp. & Nat'l Academy of Pub. Admin., *Federal Bureau of Prisons: Healthcare Quality Assessment* (2024) ..............................6, 7, 9

Laura M. Maruschak et al., DOJ, *Survey of Prison Inmates, 2016: Medical Problems Reported by Prisoners* (2021).......................................................12

Office of the Inspector Gen., *Audit of the Federal Bureau of Prisons Comprehensive Medical Services Contracts Awarded to the University of Massachusetts Medical School* (2022) ...................12

Office of the Inspector Gen., *Audit of the Federal Bureau of Prisons' Efforts to Maintain and Construct Institutions* (2023) ..................................16

iv

Office of the Inspector Gen., *Challenge 1: The Ongoing Crisis Facing the Federal Corrections System* (last visited Jan. 25, 2025) ......................................16, 17

Office of the Inspector Gen., *Concurrent Inspections of BOP Food Service Operations* (June 17, 2025) .................................................15, 16

Office of the Inspector Gen., Dep't of Justice, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (2015; rev. 2016).................4, 6, 8, 9, 11, 12

Office of the Inspector Gen., *Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prison Institutions* (2024) ...........................7, 15, 16

Office of the Inspector Gen., *Evaluation of the Federal Bureau of Prisons' Colorectal Cancer Screening Practices for Inmates and Its Clinical Follow-up on Screenings* (2025) .........................6, 9, 10, 11, 12, 13

Office of the Inspector Gen., *Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Waseca* (2023) ......................................................8, 9

Office of the Inspector Gen., *Inspection of the Federal Bureau of Prisons' Federal Medical Center Devens* (2024) ......................................................7, 8, 12, 13

Office of the Inspector Gen., *Management Advisory Memorandum 21-011: Analysis of the Federal Bureau of Prisons' Fiscal Year 2019 Overtime Hours and Costs* (2020)....................................................15

Office of the Inspector Gen., *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (2016) ........................................................................6

v

Office of the Inspector Gen., *The Federal Bureau of Prisons' Efforts to Manage Inmate Health Care* (2008) ...............................................................6, 12

Office of the Inspector Gen., *The Federal Bureau of Prisons' Reimbursement Rates for Outside Medical Care* (2016) ...............................................................6

**Other Authorities**

*1 in 4 inmate deaths happens in the same federal prison. Why?*, NPR (Sept. 23, 2023).....................17

*Lawmakers push for federal prison oversight after reports of inadequate medical care*, NPR (Dec. 12, 2023) ......................................................................17

*One doctor for 941 sick inmates isn't enough*, Bos. Globe (Mar. 27, 2025).........................................8, 17

Partnership for Pub. Serv., *Best Places to Work in the Federal Government: Federal Bureau of Prisons* (last visited February 18, 2025) ...........................15

## INTEREST OF AMICI CURIAE[1]

Amici have well over one hundred years of combined experience working for the federal Bureau of Prisons ("BOP") in roles ranging from correctional officer to warden.  Together, they have worked with or been responsible for tens of thousands of inmates. They are each intimately familiar with the federal corrections system, the resource constraints it operates under, and the disproportionate share of those resources consumed by caring for aging and unhealthy inmates, including those who could safely be released.

Maureen Baird spent 28 years working for BOP.  She began her career as a Case Manager, rose through the ranks to work in Correctional Programs Administration, and eventually served as Warden of three separate federal prisons.  She retired as Warden of the U.S. Penitentiary in Marion, Illinois, where she oversaw 1,500 medium- or high-security inmates. During her BOP tenure, she also served on the Joint Terrorist Task Force, and held Top Secret clearance. Ms. Baird now works as a corrections consultant and has provided expert testimony on matters including sentencing and extradition.

Janet Perdue began her career as a probation officer, then spent 34 years with BOP.  She has worked in nearly all phases of the corrections process, from probation and as a corrections officer, through Correctional Program Administration and leadership roles as an Associate Warden, and finally in a regional position managing residential reentry for inmates

---

[1] Pursuant to Supreme Court Rule 37.6, amici state that no counsel for any party authored this brief in whole or in part, and no entity or person aside from amici or their counsel made any monetary contribution intended to fund the preparation or submission of this brief.

2

nearing the end of their sentences. While serving as
Associate Warden at the Metropolitan Correctional
Center in Chicago, Ms. Perdue was responsible for
cases with Special Administrative Measures,
including international and domestic terrorists and
drug cartel leaders. Ms. Perdue now works as a
consultant and has served as an expert witness on
institutional operations issues for correctional
facilities.

Percy Pitzer has more than 40 years of experience
working in corrections, including 25 years with BOP.
After serving in the United States Army, he began his
BOP career as a correctional officer, and retired as
Warden of a major U.S. penitentiary. After his
retirement from BOP, Mr. Pitzer founded Creative
Corrections, a leading management consulting firm
specializing in corrections and security. Creative
Corrections is the only company in the United States
with ISO 17020:2012 accreditation, which qualifies it
to audit prisons in the United States and around the
globe, and it has conducted more than 1,800 audits.

Stephen Spaulding is a Navy veteran and former U.S.
Public Health Service officer detailed to BOP. Over
his 23 years at BOP, he served as a Health Services
Administrator and as the Health Service Warden at
three federal prisons. By the time of his retirement
from BOP, Mr. Spaulding had been promoted to
Assistant Surgeon General and held the rank of Rear
Admiral. Mr. Spaulding now serves as the Managing
Director of Creative Corrections, the consulting firm
Mr. Pitzer founded.

Jack Donson worked with BOP for 23 years in roles
including Case Manager, Unit Manager, and Case
Management Coordinator. He received several
national awards in recognition of his service, and

3

served as an instructor training senior BOP staff. Mr. Donson is currently the Executive Director of the Federal Prison Education and Reform Alliance, and is a nationally-recognized advocate and expert witness on federal corrections reform. Mr. Donson also serves as chair of the American Bar Association's Standing Subcommittee on Federal BOP Policy and on the corrections committee of the National Association of Criminal Defense Attorneys.

Jeff Norman worked for 18 years in senior leadership roles within the Missouri Department of Corrections, serving as the Warden of four different facilities, Deputy Division Director, and retiring as the Director of the Division of Adult Institutions. As Director, he was responsible for 20 institutions and more than 24,000 inmates. He has served for the past four years as an officer in the North American Association of Wardens and Superintendents. He currently provides strategic guidance and operational support to correctional agencies and facilities as a subject matter expert with Salke Advisory Group and Creative Corrections.

Having devoted their professional careers to corrections and spent more than a century working alongside BOP staff and inmates, amici have a strong interest in the safe and efficient functioning of our federal prisons. As BOP staff, consultants, and experts, amici have seen the disproportionate and unnecessary drain on BOP resources caused by keeping reformed inmates imprisoned as they age and their health deteriorates. Those resources include money spent on housing and caring for those inmates and time and attention from prison staff and leadership, all of which are precious commodities in our nation's budget-constrained and understaffed

4

correctional facilities. Compassionate release of
reformed, high-needs inmates enables reallocation of
resources to other priorities, including critical safety
and security needs with significant benefits for BOP
staff and inmates.

Amici also appreciate the important difference
between a case-by-case review of an individual's
circumstances, based on all of the relevant
information, and a one-size-fits-all retroactive
sentencing change. With their decades of personal
experience, they know that not all inmates are alike,
including in whether they can safely be returned to
the community.

Amici therefore support empowering district courts to
undertake a comprehensive, case-specific review of
applications for compassionate release that considers
all relevant circumstances, including the First Step
Act's drastic reductions in sentences for certain
offenses.

## SUMMARY OF THE ARGUMENT AND INTRODUCTION

The prisoners potentially eligible for compassionate
release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) who
are serving "unusually long sentence[s]" with "gross
disparity between the sentence being served and the
sentence likely to be imposed at the time the motion
is filed" are especially likely to become elderly and
unhealthy or disabled in prison.[2]       U.S.S.G.
§ 1B1.13(b)(6) (Nov. 1, 2023). Intensive medical care
for inmates consumes a disproportionate share of
BOP's scarce resources, with well-documented,

---

[2] Office of the Inspector Gen., Dep't of Justice, *The Impact of an
Aging Inmate Population on the Federal Bureau of Prisons* 15-16
(2015; rev. 2016), https://tinyurl.com/3p2855ye.

5

cascading effects on federal prison operations and the
safety and security of BOP staff and inmates.
Expanding access to compassionate release for
inmates who can safely reenter the community by
confirming that district courts can take changes in
sentencing law into account when considering
applications will alleviate one of the major challenges
facing BOP, as the Sentencing Commission
understood when it promulgated U.S.S.G.
§ 1B1.13(b)(6). The Court should therefore rule in
petitioners' favor and reverse the decisions of the
Third Circuit.

## ARGUMENT

I.    **Expanding access to compassionate
      release for inmates serving unusually
      long sentences would benefit BOP.**

The cost and burden of providing inmate medical care
is an entrenched problem for BOP. Inmates serving
"unusually long sentence[s]" with "gross disparity
between the sentence being served and the sentence
likely to be imposed at the time the motion is filed" are
especially likely to exacerbate this problem.

As early as 2000, the Government Accountability
Office ("GAO") raised alarms that longer sentences
and expanded federal criminal prosecutions would
produce a larger, older inmate population, causing the
difficulty and cost of caring for federal prisoners to
balloon.[3] This forecast proved accurate. Subsequent
reports and testimony from GAO, the Office of the
Inspector General of the Department of Justice

---

[3] *Containing Health Care Costs for an Increasing Inmate
Population, Testimony Before the Subcomm. on Criminal Justice
Oversight*, 106th Cong. 6 (Apr. 6, 2000) (statement of Richard M.
Stana, Assoc. Dir.), https://tinyurl.com/yc54jz99.

6

("OIG"), and BOP's own consultants in 2008,[4] 2015,[5] 2016,[6] 2017[7], 2024,[8] and 2025[9] documented systemic problems with the cost and delivery of medical care to the inmate population across federal prisons.

---

[4] OIG, *The Federal Bureau of Prisons' Efforts to Manage Inmate Health Care* 15, 22-23, 25-33 (2008), https://tinyurl.com/528p93b3 (observing deficiencies in primary and other care while per capita costs increased at a "reasonable" rate). The per-inmate increases from 2000 to 2006 may have been "reasonable," but the federal prison population grew by 32% in the same period. BOP, *Federal Prison System Population Actuals* (downloaded Feb. 20, 2025), https://tinyurl.com/mu552e5r.

[5] *See generally* OIG, *Impact of an Aging Inmate Population*, *supra* (finding that aging inmates are a growing and particularly expensive portion of BOP's inmate population).

[6] *See generally* OIG, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (2016), https://tinyurl.com/bdetfbr3; OIG, *The Federal Bureau of Prisons' Reimbursement Rates for Outside Medical Care* (2016), https://tinyurl.com/5n73657c (finding BOP could save at least $100 million by reimbursing outside medical providers at Medicare rates); Michael E. Horowitz, Inspector General, DOJ, Statement Before the U.S. Sentencing Commission Hearing on "Compassionate Release and the Conditions of Supervision" 5 (Feb. 17, 2016), https://tinyurl.com/3ttteba4.

[7] GAO, *Better Planning and Evaluation Needed to Understand and Control Rising Inmate Health Care Costs* (2017), https://tinyurl.com/5hauje9a.

[8] Jefferson Consulting Grp. & Nat'l Academy of Pub. Admin., *Federal Bureau of Prisons: Healthcare Quality Assessment* 26-27 (2024), https://tinyurl.com/6pasa4rk.

[9] OIG, *Evaluation of the Federal Bureau of Prisons' Colorectal Cancer Screening Practices for Inmates and Its Clinical Follow-up on Screenings* (2025), https://tinyurl.com/4dx5rws3.

7

BOP struggles to hire and retain healthcare professionals.[10]    Only approximately 80% of authorized positions are filled across BOP.[11]    That concerning statistic understates the problem in at least four ways.    First, it conceals facility-by-facility variation: some facilities have fewer than 50% of authorized positions filled.    Second, it ignores the fact that many "filled" positions are functionally vacant due to leaves.    Third, the number of "authorized" healthcare positions is itself inadequate.    It is less than 60% of the number of positions recommended by internal and external analyses.[12]    Of "recommended" positions, slightly fewer than half are filled.    Fourth, it fails to account for the shortage of outside contractors willing to provide diagnostic testing and other routine healthcare services to prisoners.

OIG's recent audit of Federal Medical Center Devens is a good example.    FMC Devens has a 76% medical staffing rate,[13] only slightly below the national

---

[10] *Oversight of the Federal Bureau of Prisons: Hearing Before the Subcomm. on Crime & Fed. Gov't Surveillance of the H. Comm. on the Judiciary*, 118th Cong. 5 (July 23, 2024) [hereinafter "BOP Oversight Hearing 2024"] (statement of Colette S. Peters, Dir., BOP), https://tinyurl.com/yck6pzf4; OIG, *Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prison Institutions* 64-67 (2024), https://tinyurl.com/bdfd4jrz.

[11] *Oversight of the Federal Bureau of Prisons: Hearing Before the Subcomm. on Crime & Fed. Gov't Surveillance of the H. Comm. on the Judiciary*, 118th Cong. 4-5, 8 (Nov. 7, 2023) [hereinafter "BOP Oversight Hearing 2023"] (statement of Colette S. Peters, Dir., BOP), https://tinyurl.com/ya4wfycx.

[12] Jefferson Consulting Grp. & Nat'l Academy of Pub. Admin., *Federal Bureau of Prisons: Healthcare Quality Assessment* 26-27 (2024), https://tinyurl.com/6pasa4rk.

[13] OIG, *Inspection of the Federal Bureau of Prisons' Federal Medical Center Devens* 10-11 (2024), https://tinyurl.com/383a932t.

8

average. But between vacancies and extended leaves, there was only one practicing physician serving 941 inmates—and this at a facility intended, as the name says, to provide specialized or intensive medical care.[14] Of the remaining health services employees, one quarter were required to perform correctional officers' duties instead of their ordinary job duties, a practice called "augmentation." Many of the inmates at FMC Devens were transferred there because they need intensive or specialized treatment that could not be provided in their prior facilities. Increasingly, that care cannot be provided at FMC Devens, either. At various times in 2024, FMC Devens requested and received pauses on inbound transfers of inmates for services that FMC Devens is uniquely equipped among BOP facilities to provide, including advanced medical care, dementia care, and orthopedic care.

Lack of capacity and other difficulties at one facility like Devens have ripple effects throughout the federal corrections system.[15] An OIG audit of FCI Waseca, a women's prison serving 800-plus prisoners, is illustrative. The audit found that FCI Waseca was holding and treating inmates needing care that it was not equipped to provide because the only Federal Medical Center for female inmates, FMC Carswell, had run out of space to accept transfers.[16] FCI Waseca itself was above capacity: it was rated for 712 inmates but held 806. The healthcare staff, which had

---

[14] *Id.* at 2, 10-11. Reportedly, for several months after the OIG report came out, FMC Devens had no physicians at all. Editorial Bd., *One doctor for 941 sick inmates isn't enough*, Bos. Globe (Mar. 27, 2025), https://tinyurl.com/3khhrp8m.

[15] OIG, *Impact of an Aging Inmate Population, supra*, at 26.

[16] OIG, *Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Waseca* 2, 27-28 (2023), https://tinyurl.com/3sekh5vc.

9

a quarter of its positions vacant and was already in high demand, was stretched even thinner.[17] Both medical practitioners and psychology staff found that they had to prioritize higher-needs inmates with more urgent issues and postpone routine care.[18] Even with overtime-eligible healthcare staff working an average of 100 overtime hours per year each, the backlog in care at FCI Waseca affected hundreds of inmates.[19] The problems at FCI Waseca happen to be well-documented in an OIG audit, but other women's prisons throughout the federal corrections system doubtless experienced the same problems when FMC Carswell stopped accepting transfers.[20]

Across BOP, limited funds, inadequate staffing, and a large and aging inmate population leave healthcare capabilities "strained" (as a 2024 report by BOP's consultants put it).[21] This strain undermines safe, secure, efficient, and humane operations throughout BOP. Overstretched healthcare staff are forced to prioritize medical crises that consume more time and resources and leave less acute problems to fester until those problems turn into new medical crises.

This vicious cycle is apparent in a recent OIG report on colorectal cancer screening and treatment in federal prisons.[22] Removing a precancerous polyp is easier and cheaper than treating cancer, so BOP guidance calls for annual screening of all federal

---

[17] *Id.*
[18] *Id.* at 28.
[19] *Id.* at 3, 27-29.
[20] *See* OIG, *Impact of an Aging Inmate Population, supra*, at 16, 25-26.
[21] Jefferson Consulting Grp. & Nat'l Academy of Pub. Admin., *Healthcare Quality Assessment, supra*, at 8.
[22] OIG, *Colorectal Cancer Screening Practices, supra.*

10

prisoners between the age of 45 and 75.[23]  However,
less than two-thirds of inmates at average risk are
even offered an initial screening,[24] and most of BOP's
facilities screen half or fewer of their average-risk
inmates.[25]  Like healthcare services staffing rates, the
screening rate varies dramatically by facility, from
94% at one high-performing facility to 0% at
another.[26]  BOP healthcare providers told OIG that
after positive screens, they aim to provide
colonoscopies within one to four months, or faster in
urgent cases; the actual median wait time is seven
months.[27]  Unsurprisingly, a significant cause of low
screening rates is staff vacancies.[28]  Per the report,
vacancies directly and indirectly affect screening
rates: directly, because facilities experience
"significant variations in their screening rates
depending on whether the Health Services position
typically responsible for CRC screening [i]s filled";
and indirectly, because "staffing shortages often mean
that employees have to prioritize addressing urgent
medical needs and daily responsibilities, such as
medication delivery and sick call, over preventive
care."[29]

The rub is that inadequate preventive care tends to
create urgent medical needs.  One prisoner had three
positive initial screens from 2019-2021 and a note in
his file that he should undergo a colonoscopy, but BOP
had no record of offering him a colonoscopy after the

---

[23] *Id.* at 1-2, 8, 17.
[24] *Id.* at 8.
[25] *Id.* at 15.
[26] *Id.* at 15.
[27] *Id.* at 24, 26-28.
[28] *Id.* at 10-11.
[29] *Id.*

11

second or third positive screens.[30] He sought medical
care repeatedly from 2022 to 2023 for urinary tract
infections before dying of metastatic colon cancer in
2023.[31] Another prisoner, who presented with highly
suggestive indications of cancer, was repeatedly
referred for "urgent" colonoscopies or oncology
consultations that occurred late or not at all.[32] It took
six months after he first sought treatment to arrange
a successful colonoscopy and diagnose him with colon
cancer.[33] The same day he was diagnosed, he
presented at sick call because his symptoms had
escalated from bowel problems to "severe weakness,
abdominal pain, loss of appetite . . . weight loss," and
"jaundice."[34] Two weeks after that, he died.[35]

Amici have seen firsthand how BOP's medical-care
crisis not only perpetuates itself but interferes with
every facet of prison operations:

- Wardens, associate wardens, and other facility
  leadership must stay apprised of each critical
  healthcare issue and help healthcare staff
  allocate and access resources, taking time away
  from other pressing problems.
- Prisons become more likely to send prisoners to
  outside service providers for treatment.[36]
  Doing so requires escorts from correctional
  officers who would otherwise be helping
  maintain order at the facility. BOP already
  faces correctional officer staffing shortages—

---

[30] *Id.* at 35-36.
[31] *Id.* at 36.
[32] *Id.* at 38-39.
[33] *Id.* at 39.
[34] *Id.*
[35] *Id.*
[36] OIG, *Impact of an Aging Inmate Population, supra*, at 13-14,
18.

12

hence the need for "augmentation"—and the need for escorts only exacerbates the problem.[37] Worse, outside medical appointments are frequently cancelled or rescheduled, imposing additional burdens on BOP staff, undermining BOP's relationships with outside service providers, and further interfering with inmates' care.[38]

- Prisoners who become disabled due to complex medical problems or during treatment can struggle to navigate daily life in prison.[39] Disabled inmates need more attention and support from staff and, often, accessible infrastructure that may not be available in their current facility.[40]

---

[37] *Id.* at 18; OIG, *Colorectal Cancer Screening Practices, supra,* at 28-29.

[38] *Id.* at 18-19; OIG, *Audit of the Federal Bureau of Prisons Comprehensive Medical Services Contracts Awarded to the University of Massachusetts Medical School* 14, 18 (2022), https://tinyurl.com/tfc7vkwd.

[39] For example: untreated diabetes can cause blindness. Roughly one in fifteen federal prisoners in 2016 had diabetes. Laura M. Maruschak et al., DOJ, *Survey of Prison Inmates, 2016: Medical Problems Reported by Prisoners* 5 (2021), https://tinyurl.com/mwm8mdws. Federal prisons regularly do not meet BOP targets for clinical management of diabetes. OIG, *Efforts to Manage Inmate Health Care, supra,* at 52, 99 (institutions missed care targets nearly 40% of the time); OIG, *Inspection of FMC Devens supra,* at 22 (finding that of 20 diabetic inmates who were supposed to receive blood sugar testing every three months, five had not).

[40] OIG, *Impact of an Aging Inmate Population, supra,* at 19-21, 27-30. Institutions also use other inmates as companions for disabled inmates, but companions can pose risks to vulnerable inmates. *Id.* at 19-21; OIG, *Inspection of FMC Devens, supra,* at

13

- Actual or perceived deficiencies in care can affect inmates' willingness to seek care or lead to litigation or escalating tensions with inmates.[41]

Federal Medical Centers are supposed to take pressure off other facilities by accepting transfers of prisoners with advanced or specialized medical needs. But as the OIG's reports on FMC Devens and FCI Waseca show, the Federal Medical Centers themselves are overburdened and cannot consistently fulfill their role.

In sum, aging prisoners consume disproportionate time and funds—two things BOP cannot spare—with cascading consequences for facility safety and security. Unnecessarily keeping older inmates who could safely be released in prison despite their potential for disproportionately consuming BOP's scarce resources exacerbates this serious problem. For the same reason, the potential to seek compassionate release based on serious medical issues after they reach the critical phase, *see* U.S.S.G. § 1B1.13(b)(1), does not alleviate the problem: an emergency compassionate release petition is just another avoidable crisis consuming BOP's time and funds.

---

24-25 (finding that in violation of BOP policies, FMC Devens was using inmates who had committed sexual or violent offenses as companions). Institutions must also have funds available to compensate companions. Amicus Spaulding recalls that after BOP significantly reduced inmate compensation, the number of inmates willing to work as companions declined, pushing the obligation to assist disabled inmates back onto staff.

[41] *See, e.g.*, OIG, *Colorectal Cancer Screening Practices*, *supra*, at 12, 29, 35 n.25, 39.

14

The healthcare crisis at BOP is critical context to the U.S. Sentencing Commission's policy statement defining "extraordinary and compelling circumstances" to include changes in sentencing law like the one at issue here. *See* U.S.S.G. § 1B1.13(b)(6). Its decision to adopt U.S.S.G. § 1B1.13(b)(6) was informed by public comments raising many of the same concerns regarding unnecessary strain on BOP's resources that are laid out in this brief. Proposed Amendments/Public Comment 88 FR 7180, United States Sentencing Commission, 956, 1084, 1455, 1608 (March 2023); 88 Fed. Reg. 28254, 28256.

The Sentencing Commission's view that interpreting "extraordinary and compelling circumstances" to include changes in sentencing law "further[s] the purposes of sentencing" and is an "appropriate" use of the compassionate release statute, *see* U.S.S.G. §1B1.13, cmt. background (Nov. 1, 2023), is entitled to significant weight as the product of an explicit Congressional delegation. Congress expressly empowered the Sentencing Commission to define "extraordinary and compelling circumstances" justifying compassionate release, 28 U.S.C.A. § 994(t), and further directed courts to "abide by the Sentencing Commission's policy statements" in considering compassionate release, *see Concepcion v. United* States, 597 U.S. 481, 495 (2022); 18 U.S.C.A. § 3582(c)(1)(A). The Commission's considered implementation of this Congressional charge is entitled to respect.

II.   **Medical care is just one of the multiple intersecting crises facing BOP.**

The practical problems of an aging prison population cannot be addressed simply by reallocating resources. The resources are not there. BOP faces a range of

15

costly and stubborn problems, each of which demands
time, attention, and resources. They include:

- *Severe staffing shortages across all facilities
  and programs.* Healthcare is not the only area
  where BOP struggles to hire—only the worst.[42]
  Staffing shortages for correctional officers and
  other employees interfere with BOP's ability to
  perform any but the most basic and pressing
  operational needs. Operating with these staff
  shortages means augmentation and mandatory
  overtime. These measures are both expensive
  and inadequate. In the long run, they damage
  staff morale and performance.[43]

- *The downstream effects of staffing shortages.* In
  addition to healthcare delivery problems, the
  "cascading effects" of staffing shortages include

---

[42] OIG, *Evaluation of Issues Surrounding Inmate Deaths*, *supra*,
at 67-70; OIG, *Management Advisory Memorandum 21-011:
Analysis of the Federal Bureau of Prisons' Fiscal Year 2019
Overtime Hours and Costs* 12-14 (2020) (reviewing other reports'
findings on staffing problems over the prior five years),
https://tinyurl.com/4pc4vufm; OIG, *Concurrent Inspections of
BOP Food Service Operations* (June 17, 2025),
https://tinyurl.com/y3zaksbs (finding persistent understaffing in
food services resulted in problems such as theft of food and losing
track of kitchen knives across multiple institutions).

[43] BOP had the lowest job satisfaction of any federal sub-agency
in the 2022 and 2023 Partnership for Public Service survey, and
had a net loss of 6.9% of its employees from 2021 to 2023.
Partnership for Pub. Serv., *Best Places to Work in the Federal
Government: Federal Bureau of Prisons* (last visited February 18,
2025), https://tinyurl.com/j29hh2kd.

16

difficulties controlling contraband and preventing inmate violence and suicides.[44]

- *An estimated \$3 billion or more in deferred maintenance costs across BOP facilities.* Deteriorating facilities complicate operations, interfere with safety and security, and harm employee morale and retention. Congressional appropriations for prison infrastructure, which ranged from \$59 to \$290 million annually from 2019 to 2023, were consistently inadequate to address the problem.[45] Recently, Congress allocated \$2 billion through 2029 for maintenance and repair of facilities.[46] While a significant improvement, that appropriation still falls well short of the amount required to address maintenance that was already deferred before the money was appropriated.[47] Further, spending that much money in four years is itself a major undertaking requiring time and attention that BOP does not have to spare.

These challenges are matters of public record: they have been documented for years in Congressional

---

[44] *E.g.*, OIG, *Challenge 1: The Ongoing Crisis Facing the Federal Corrections System* (last visited Jan. 25, 2025), https://tinyurl.com/4xkp8jkn; OIG, *Evaluation of Issues Surrounding Inmate Deaths*, *supra*, at 10-33, 54-62; OIG, *Concurrent Inspections of BOP Food Service Operations*, *supra*.
[45] *See generally* OIG, *Audit of the Federal Bureau of Prisons' Efforts to Maintain and Construct Institutions* (2023), https://tinyurl.com/59h3dync; BOP Oversight Hearing 2023, *supra*, at 7-8 (statement of Colette S. Peters, Dir., BOP).
[46] One Big Beautiful Bill, H.R. 1, 119th Cong. § 100056(a), (c) (2025) (became Pub. L. No. 119-21).
[47] BOP Oversight Hearing 2024, *supra* (statement of Colette S. Peters, Dir., BOP).

17

testimony,[48] OIG reports[49] and other government
publications,[50] and media reports.[51]  They are also
illustrated by the widespread and bipartisan support
for 2024's Federal Prison Oversight Act,[52] which
instructed the OIG to audit and grade every BOP
facility based on factors including availability of
medical staff and resources,[53] required BOP to nearly
eliminate augmentation,[54] and established an
ombudsman for BOP.[55]  The Act had 40 sponsors from
both major parties in the House, where it passed
nearly unanimously, and was sponsored in the Senate
by Senators Ossoff (D-GA), Braun (R-IN), Durbin (D-
IL), Manchin (I-WV), Capito (R-WV), and Kaine (D-
VA).

Aging prisoners pose outsize burdens on federal
prisons.  Allowing prisoners seeking compassionate

---

[48] *Id.*; BOP Oversight Hearing 2023, *supra* (statement of Colette
S. Peters, Dir., BOP).

[49] *E.g.*, OIG, *The Ongoing Crisis Facing the Federal Corrections
System*, *supra*.

[50] *E.g.*, GAO, *GAO-23-106203: High-Risk Series* 8, 118-22 (Apr.
20, 2023), https://tinyurl.com/5h4hbuwn (explaining why BOP is
being added to GAO's high-risk list).

[51] *E.g.*, Editorial Board, *One doctor for 941 sick inmates isn't
enough*, Boston Globe (Mar. 27, 2025),
https://tinyurl.com/3khhrp8m; *Lawmakers push for federal
prison oversight after reports of inadequate medical care*, NPR
(Dec. 12, 2023), https://tinyurl.com/48ajm8tf; Meg Anderson, *1 in
4 inmate deaths happens in the same federal prison. Why?*, NPR
(Sept. 23, 2023), https://tinyurl.com/5f3ztvnk.

[52] Pub. L. No. 118-71, 138 Stat. 1492 (2024).

[53] *See id.* sec. (a), § (e)(2), 138 Stat. at 1493-96.

[54] *See id.* sec. (c), 138 Stat. at 1501-02 (requiring BOP to follow
directive "to ensure that non-custody correctional employees
must spend 90 percent of their work week in their primary
positions" in Committee on Appropriations, 117th Cong., Joint
Explanatory Statement of Public Law 117-328, at 297 (2023)).

[55] *See id.* sec. (a), § (e)(3), 138 Stat. at 1496-98.

18

release to rely in part on a "gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed" will ease those burdens and enable BOP to dedicate more time, attention, and resources to safety, security, facility improvements, and other critical needs.

## CONCLUSION

Amici respectfully request that the Court rule in favor of petitioners and reverse the judgments of the Third Circuit.

Respectfully submitted,

SCOTT P. LEWIS
*Counsel of Record*
TAMARA S. WOLFSON
AUSTIN P. ANDERSON
PAUL M. KOMINERS
ANDERSON & KREIGER LLP
50 Milk Street, 21st Floor
Boston, Massachusetts 02109
(617) 621-6500
lewis@andersonkreiger.com
*Counsel for Amici Curiae*

August 14, 2025