BILAL A. ESSAYLI
First Assistant United States Attorney
ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division
JOHNPAUL LECEDRE (Cal. Bar No. 303100)
Assistant United States Attorney
Post-Conviction and Special Litigation Section
     1400 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-4447
     Facsimile: (213) 894-0142
     E-mail:   johnpaul.lecedre@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARRY BYRON MILLS, et al.,<br><br>     WAYNE BRIDGEWATER (13),<br><br>          Defendant,<br><br>               v.<br><br>UNITED STATES OF AMERICA,<br><br>          Plaintiff. | No. 2:02-cr-00938-DOC-13<br><br>GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO REDUCE SENTENCE UNDER 18 U.S.C. § 3582(c)(1)(A); DECLARATION OF JOHNPAUL LECEDRE; EXHIBITS A – J |

Plaintiff, UNITED STATES OF AMERICA, by and through its counsel of record, Assistant United States Attorney JohnPaul LeCedre, hereby files this Response to the Compassionate Release Request pursuant to 18 U.S.C. § 3582(c)(1)(A) filed by WAYNE BRIDGEWATER ("Defendant"). (docket number ("Dkt.") 7496).

//

//

This Opposition is based on the attached memorandum of points and authorities, the files and records in this case, Declaration of JohnPaul LeCedre ("LeCedre Decl."), attached exhibits, and such other evidence or argument as may be requested by the Court.

Dated: November 17, 2025            Respectfully submitted,

                                    BILAL A. ESSAYLI
                                    First Assistant United States
                                        Attorney

                                    ALEXANDER B. SCHWAB
                                    Assistant United States Attorney
                                    Acting Chief, Criminal Division


                                      /s/ JohnPaul LeCedre
                                    JOHNPAUL LECEDRE
                                    Assistant United States Attorney

                                    Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

I.     INTRODUCTION.................................................................1

II.    BACKGROUND...................................................................2

       A.    Procedural History...................................................2

       B.    Defendant's Motion...................................................4

       C.    Administrative Remedies..............................................6

III.   LEGAL STANDARD...............................................................7

IV.    ARGUMENT.....................................................................9

       A.    Defendant Bears the Burden of Establishing
             Extraordinary and Compelling Reasons.................................9

       B.    Defendant's Medical Conditions Do Not Satisfy §
             1B1.13(b)(1)........................................................10

             1.    BOP's most recent medical review found that he
                   does not qualify under any medical category..................10

             2.    Defendant's own medical records show ongoing care
                   and normal functioning—not a medical cris BOP
                   cannot handle...............................................11

             3.    Defendant has not come close to showing a
                   diminished ability to self-care.............................13

       C.    Defendant Does not Qualify Under the Elderly-Inmate
             Provision of § 1B1.13(b)(2).......................................14

       D.    Generalized Policy Critiques of BOP Do Not Constitute
             "Extraordinary and Compelling" Reasons............................16

       E.    The § 3553(a) Factors Weigh Strongly Against Release.....17

             1.    The Nature and Circumstances of the Offense Are
                   as Serious as Federal Crimes Come...........................18

             2.    Defendant's History and Characteristics
                   Demonstrate Enduring Danger, Even at An Advanced
                   Age.........................................................19

             3.    Deterrence and Respect for the Law..................20

             4.    Continued Incarceration is Necessary to Protect
                   the Public..................................................21

             5.    Reducing This Sentence Would Create a Disparity
                   that No Court Has Ever Endorsed.....................23

          6.    The § 3553(a) Factors End the Inquiry...............24

V.    CONCLUSION.......................................................24

**TABLE OF AUTHORITIES**

Dillon v. United States, 560 U.S. 817 (2010).....................7, 17

Freeman v. United States, 564 U.S. 522 (2011).......................7

Roberts v. Dist. Ct., 339 U.S. 844 (1950)...........................8

Rutherford v. United States, Docket No. 24-820......................5

United States v. Aruda, 993 F.3d 797 (9th Cir. 2021)................7

United States v. Bryant, 144 F.4th 1119 (9th Cir. 2025)..........7, 8

United States v. Houston, 648 F.3d 806 (9th Cir. 2011)....1, 3, 4, 18

United States v. Keller, 2 F.4th 1278 (9th Cir. 2021).......7, 8, 18

United States v. Wright, 46 F.4th 938 (9th Cir. 2022)..........9, 16

United States v. Ebbers, 432 F. Supp. 3d 421 (S.D.N.Y. 2020).......21

United States v. Ayon-Nunez, 2020 WL 704785 (E.D. Cal. Feb. 12, 2020)...........................................................14

United States v. Esparza, 2020 WL 4805055 (C.D. Cal. 2020).........16

United States v. Weidenhamer, 2019 WL 6050264 (D. Ariz. Nov. 8, 2019)...........................................................13

United States v. Willis, 2021 WL 2179256 (D. Or. May 27, 2021).....14

**STATUTES**

18 U.S.C. § 1959 ("VICAR")....................................passim

18 U.S.C. § 1962, et seq. ("RICO")..................................2

18 U.S.C. § 3553..............................................passim

18 U.S.C. § 3582..............................................passim

**OTHER AUTHORITIES**

BOP Program Statement 5050.50.......................................6

**RULES**

U.S.S.G. § 1B1.13.............................................passim

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Wayne Bridgewater, REG: 20220-148, ("Defendant") an inmate at United States Penitentiary ("USP") Florence Administrative Maximum Facility (commonly referred to as "ADX Florence" or "Florence Supermax"), asks this Court to reduce the life sentences he received for two premediated VICAR murders, an attempted murder, and related racketeering crimes committed to advance within the Aryan Brotherhood ("AB") gang. The request is legally baseless and factually implausible. Nothing about Defendant's age, medical conditions, or housing at the Supermax prison, where he is classified as a high-security inmate and more than four decades into a career of institutional violence, can overcome the gravity of offenses for which he was sentenced or the danger he continues to present.

The Ninth Circuit has already described these murders in detail in a published appellate decision, United States v. Houston, 648 F.3d 806 (9th Cir. 2011). Defendant volunteered and recruited others to commit prison murders and personally stabbed two victims several dozen times. During the course of the extreme violence he perpetuated, he brazenly declared that he would not stop killing until someone killed him. These were not impulsive acts by a frightened or frail old man. They were the planned, deliberate executions of a fully committed Aryan Brotherhood soldier acting to increase his standing in one of the most violent criminal organizations in the history of the federal prisons.

Nothing in Defendant's instant motion alters this reality. His Bureau of Prisons ("BOP") medical records show chronic, but stable conditions and consistent pain management. He is not classified as

1

terminal, not incapacitated, and fully capable of performing
activities of daily living. He has served only 17 years on the life
without the possibility of parole sentence he seeks to reduce, far
short of the 30-year threshold required for "unusually long
sentences" relief—and he identifies no change in law that would alter
the life terms Congress mandates for VICAR murder. Most importantly,
Defendant cannot satisfy the mandatory requirement that he "not be a
danger to the safety of any other person or the community."
§1B1.13(a)(2). A defendant twice convicted of racially motivated,
premeditated prison murders, who remains designated as high security
and housed at a Supermax prison, is the very type of offender for
whom compassionate release is categorically inappropriate.

Even assuming Defendant could identify any extraordinary and
compelling circumstance—which he cannot—the § 3553(a) factors
foreclose relief as a matter of law. Reducing the sentence of an
Aryan Brotherhood killer who carried out execution-style murders to
advance his position within a violence prison gang would profoundly
undermine respect for the law, create an unjustified sentencing
disparity, and deprive the public of the protection his life
sentences provide.

Defendant is not entitled to compassionate release. His motion
should be denied.

## II.  BACKGROUND

### A.  Procedural History

On May 30, 2007, a federal jury convicted Defendant of two
counts of first-degree murder in aid of racketeering (VICAR), one
count of attempted VICAR murder, racketeering conspiracy, and
substantive RICO participation, all arising from coordinated,

2

racially motivated murders carried out by Aryan Brotherhood members at USP Lewisburg in January 2005. Dkts. 5156, 5157. The evidence at trial established that Defendant committed the killings to maintain or increase his position within the Aryan Brotherhood. Id.

Acting under a gang-wide declaration of "war with DC Blacks," Defendant volunteered for the killing team, recruited other inmates, and armed himself with a homemade knife. See Houston, 648 F.3d at 810-11. He then participated in a coordinated, racially motivated killing operation across separate housing units. Id. at 811-12. Multiple witnesses saw Defendant repeatedly stab fellow inmate Frank Joyner, inflicting thirty-five wounds, six of them fatal. Id. A second victim, Abdul Salaam, was stabbed 34 times and bled to death on the tier floor. Id. As the violence unfolded, Defendant declared that he would "continue killing DC Blacks" and would keep killing the "niggers" until someone killed him. Id. at 812.

Following his conviction on the guilty phase, Defendant was considered for the death penalty due to the extreme circumstances of this case. Following a non-unanimous verdict at the conclusion of the penalty phase of the trial, the District Court imposed two life sentences on the VICAR murder counts, concurrent terms on the racketeering counts, and additional concurrent sentences on the remaining counts. Dkts. 5918 (Minutes of Sentencing Hearing), 5919 (Judgement & Commitment). Defendant subsequently appealed, raising challenges to the sufficiency of the evidence, the denial of a duress instruction, and several evidentiary hearings. Dkt. 5917.

The Ninth Circuit affirmed in full in a published decision on August 3, 2011. See United States v. Houston, 648 F.3d 806 (9th Cir. 2011). The Circuit Court rejected the duress claim, holding that

3

there was no credible evidence that Defendant acted under an immediate threat or lacked a reasonable opportunity to withdraw from the killing operation. Id. at 816-18. The Court further affirmed that Defendant participated in the charged murder to maintain or increase his position in the AB, thus satisfying the VICAR motive element. Id. at 818-19. The appellate record reflects that Defendant volunteered for the murder team, recruited co-participants, armed himself with a prison-made knife, and personally stabbed a victim thirty-five times. Id. at 811. The Ninth Circuit affirmed the evidence of his direct participation as more than sufficient to sustain the verdicts. Id. at 819-20.

Following sentencing, the BOP designated Defendant as a high-security inmate, later transferring him to Florence Supermax because of the severity of the murders, his documented Aryan Brotherhood Involvement, and his long history of institutional violence. Exs. D (BOP Report PP37 ARS – Facility Designation History), G (BOP Report PP37 LEV – P PD37 LEV Report – Security Classification History). He has served approximately 17 years of the life sentences he now asks this Court to reduce. Exs. H (BOP Report PP44 – Defendant's Individual Inmate Profile History), I (BOP Report PPPI – Defendant's Public Information Data History); Mot. at p. 10.

**B.   Defendant's Motion**

In his motion, filed on September 18, 2025, dkt. 7496, Defendant seeks early release pursuant to 18 U.S.C. § 3582(c)(1)(A). Mot. at p. 1. He advances two overarching theories of "extraordinary and compelling reasons"—medical deterioration and age/time served—along with several policy-based arguments about BOP resources. The motion does not raise any claims of sentencing error, changes in law, family

4

circumstances, or retroactive guideline amendments. While declaring that Defendant has "take[n] full responsibility," the motion notably does not contain the terms "murder," "kill," or "stab," only briefly describing Defendant's brutal execution-style killing as "actions that resulted in the death of two inmates and injuries to another." Mot. at p. 12.

Defendant first argues that his medical conditions—including chronic back pain, hypertension, prostate issues—satisfy various subparts of U.S.S.G. § 1B1.13(b)(1). Mot. at pp. 6-9. He particularly relies on a recent 2025 procedure with claimed complications, asserting persistent pain and decline. Id.; Ex. 3.

Second, Defendant separately invokes U.S.S.G. § 1B1.13(b)(2), asserting his age (currently 73), alleged age-related physical deterioration, and the time he has served—more than 45 years total and approximately 17 years since his sentencing on this matter—constitute an independent extraordinary and compelling category. Mot. at 9-11.

Third, the motion cites a recent amicus brief by former BOP officials in a recent Supreme Court case, Rutherford v. United States, arguing that compassionate release should be used more broadly to alleviate systemic medical-care burdens within the BOP. Mot. at 4-5, Ex. 8.

Finally, Defendant argues that the 18 U.S.C. § 3553(a) factors—including his personal background, decades of incarceration, educational programming, and the psychological impact of long-term restrictive housing in the Supermax prison—warrant a time-served sentence. Mot. at 11-14.

1          **C.    Administrative Remedies**

2          On September 18, 2024, medical staff at Florence Supermax

3     completed a Reduction in Sentence ("RIS") review for Mr. Bridgewater

4     following receipt of his request. See Declaration of JohnPaul LeCedre

5     ("LeCedre Decl.") ¶ 2a; Ex. A. The review, conducted pursuant to BOP

6     Program Statement 5050.50, evaluated whether he qualified for a

7     reduction in sentence under any of the available categories,

8     including terminal medical condition, debilitated medical condition,

9     or elderly-inmate criteria. The form reflects that medical staff

10    determined he did not meet any of the criteria. Id. The screening was

11    completed and signed by the BOP Medical Officer on September 18,

12    2024. Id.

13         Two days later, on September 20, 2024, the Interim Complex

14    Warden, Mr. J. Wadas, issued a written response to Defendant's

15    administrative compassionate release request. LeCedre Decl. ¶ 2b; Ex.

16    B. The warden confirmed that the request had been reviewed in

17    accordance with Program Statement 5050.50 and notified him that BOP

18    was denying the request. Id. The letter explained that, after

19    considering his age, medical conditions, and programming, BOP

20    determined that he did not qualify for a RIS under any of the

21    established categories. Id. The letter also advised Defendant of his

22    ability to appeal through the administrative remedy process. Id.

23         While both documents reflect that Defendant satisfied the

24    exhaustion prerequisite in 18 U.S.C. § 3582(c)(1)(A), BOP's findings

25    clearly indicate that Defendant files this motion without any agency

26    support for the extraordinary and compelling circumstances he now

27    asserts.

28

**III. LEGAL STANDARD**

After a sentence is imposed, the "rule of finality" generally forbids its modification. <u>Freeman v. United States</u>, 564 U.S. 522, 526 (2011) (plurality opinion); <u>Dillon v. United States</u>, 560 U.S. 817, 824 (2010) (judgment of conviction that includes sentence of imprisonment constitutes a final judgment and may not be modified by a district court except in limited circumstances); <u>United States v. Aruda</u>, 993 F.3d 797, 799 (9th Cir. 2021), <u>superseded in part on other grounds by</u> <u>United States v. Bryant</u>, 144 F.4th 1119 (9th Cir. 2025). Compassionate release is one of the "few narrow exceptions," <u>Freeman</u>, 564 U.S. at 526, allowing a court to "reduce the term of imprisonment" and "impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment," 18 U.S.C. § 3582(c)(1)(A); <u>Aruda</u>, 993 F.3d at 799-800.

Because this relief is drastic and permanent, courts are never obligated to award it. Rather, this Court "may" reduce a sentence but only if the defendant satisfies three statutory requirements.

<u>First</u>, before the Court can adjudicate a request for compassionate release, a defendant must meet an administrative exhaustion requirement. A defendant must first submit a request to the Warden and either exhaust appeals or wait 30 days. 18 U.S.C. 3582(c)(1)(A). This exhaustion requirement is mandatory. <u>United States v. Keller</u>, 2 F.4th 1278, 1282 (9th Cir. 2021).

<u>Second</u>, in evaluating compassionate release requests, courts must determine whether a defendant has presented "extraordinary and compelling reasons" for release. 18 U.S.C. § 3582(c)(1)(A)(i). The Ninth Circuit recently held in <u>United States v. Bryant</u>, 144 F.4th

7

1  1119 (9th Cir. 2025), that district courts are bound by the

2  Sentencing Commission's policy statement in U.S.S.G. § 1B1.13 when

3  assessing such motions. In other words, courts may not invent new

4  categories of "extraordinary and compelling reasons" beyond those

5  identified in § 1B1.13 and its commentary. Bryant, 114 F.4th at 1125-

6  26. Although courts may consider the individualized evidence a

7  defendant presents, their discretion is limited by the Sentencing

8  Commission's determination of what circumstances qualify. This

9  reflects Congress's intent that only rare and clearly delineated

10  circumstances—such as terminal illness, advanced age, or certain

11  family caregiving situations—justify sentencing reductions. See 18

12  U.S.C. 3582(c)(1)(A); U.S.S.G. § 1B1.13 & cmt. n.1.

13        Nonetheless, the plain meaning of the term "extraordinary and

14  compelling" reflects Congress's intent that only rare circumstances

15  should qualify for release. See Roberts v. Dist. Ct., 339 U.S. 844,

16  845 (1950) (per curiam) ("extraordinary" remedies are reserved for

17  "rare" cases).

18        Third, even if the first two requirements are met, courts must

19  consider the "factors set forth in section 3553(a) to the extent that

20  they are applicable." 18 U.S.C. § 3582(c)(2). A court should deny a

21  sentence reduction if the defendant does not establish that the

22  balance of the applicable § 3553(a) factors weigh in favor of

23  release. Keller, 2 F.4th at 1283-84 (district court did not abuse its

24  discretion in denying compassionate release based on § 3553(a)

25  factors).

26

27

28

**IV.  ARGUMENT**

    **A.  Defendant Bears the Burden of Establishing Extraordinary and Compelling Reasons**

Under 18 U.S.C. § 3582(c)(1)(A), a defendant seeking compassionate release must demonstrate that "extraordinary and compelling reasons warrant such a reduction," that any reduction is consistent with applicable policy statement, and that the § 3553(a) factors support release. The Ninth Circuit structures this into three steps: (1) whether the defendant has shown an extraordinary and compelling reason; (2) whether the reduction is consistent with U.S.S.G. § 1B1.13; and (3) whether the § 3553(a) factors favor release. United States v. Wright, 46 F.4th 938, 945 (9th Cir. 2022).

The defendant bears the burden at each step. Compassionate release remains an "extraordinary" form of relief, not a mechanism to revisit or reweigh a lawfully imposed sentence.

The government concedes that Defendant has satisfied the statutory exhaustion requirement. See Mot. at 5; Ex. 1. BOP processed his request, including a September 18, 2024 RIS Eligibility review and September 20, 2025 written response. Exs. A, B. More than 30 days elapsed before this motion was subsequently filed. While these documents satisfy the procedural gateway, they also provide important factual context at the merits stage: BOP medical staff and administrators evaluated his request and concluded that he did not qualify under any statutory or guideline category.

The Court may therefore proceed to the merits. Because the administrative process is complete, the question is whether Defendant may not carry his burden of demonstrating extraordinary and compelling reasons—something BOP's own findings did not support.

**B.    Defendant's Medical Conditions Do Not Satisfy §
1B1.13(b)(1)**

Defendant's motion rests almost entirely on the claim that his
health problems—back pain, past surgeries, and age-related issues—are
so severe that they amount to extraordinary and compelling reasons."
But the record does not support that claim. The medical files he
submitted, along with BOP's own evaluations, show ongoing treatment,
stability, and functioning—not the type of extreme decline that
§ 3582(c)(1)(A) requires.

1.    BOP's most recent medical review found that he does
       not qualify under any medical category

On September 18, 2024, BOP medical staff reviewed his situation,
using specific criteria required for sentence reduction. According to
that form (which Defendant filed himself), BOP determined that:

- Defendant does not have a condition that qualifies as
  "extraordinary or compelling;"

- Defendant does not fall into the "debilitated" category; and

- Defendant does not fall into the elderly-medical category.

Ex. A. This assessment reflects the professional judgment of the
medical staff who actually see him day-to-day. The Court should
consider this assessment as highly persuasive as its peaks directly
to Defendant's functioning and care. Defendant's Inmate History Care
Level reinforces this assessment, as Defendant has been classified as
"STABLE, CHRONIC CARE" for at least the past 23 years, with only a
two-week gap in 2007. Ex. E (BOP Report PD37 CAR – Defendant's Inmate
Care Level Designation).

10

      2.    **Defendant's own medical records show ongoing care and normal functioning—not a medical cris BOP cannot handle**

Defendant's own BOP medical record—spanning from 2023 to the present—show a consistent pattern across all sets of documents: he reports chronic pain, but he remains alert, communicative, mobile, and fully capable of functioning in a custodial environment. Far from demonstrating that BOP is unable to care for him, the records show consistent and regular treatment, prompt responses to complaints, and stable daily functioning.

Across several encounters, providers described him as alert, oriented, and in no acute distress. For example, during a December 11, 2024 appointment, the provider wrote that he was "alert and oriented... pleasant... [and] in no apparent distress," even when he rated his own pain as high. Ex. K at p.3. Throughout hundreds of pages and dozens of encounters, multiple doctors indicate observations that he was pleasant, generally had even and unlabored breathing, and was alert. See, e.g., Exs. J at pp. 18, 32, 52; K at pp. 29, 56, 76; L at pp. 16, 33, 97, 108. When defendant claims he is in pain, despite his ability to ambulate and remain alert, he is given appropriate treatment in the form of medication and procedures. In one example, on November 26, 2024, staff documented that he stood up from his bunk in one attempted, walked (slowly and with a limp), and kept a "nicely clean" cell with a "made" bed. Ex. K at p. 8. Earlier that month, on November 14, 2024, he was observed to have retrieved his commissary items without difficulty and interacted with staff normally. Id. at p. 11. These observations, among many, are incompatible with the type of significant functional deterioration required under § 1B1.13(b)(1).

11

The records show throughout that Defendant repeatedly states that his medication enables him to function. See, e.g., Ex. K at p. 3 (On December 11, 2024, doctor reports that "[Defendant] states that he is able to function better throughout the day when he has his medication."). His 2025 encounters with medical personnel contain numerous similar observations. See Ex. L at pp. 11, 20, 25, 46, 54, 70, 91, 97, 103 (observations of the positive effect current medication has on his condition and ability to function in 2025).

The treatment record also demonstrates regular and appropriate medical care. For example, when imaging results raised concerns about gastrointestinal issues, his provider placed a referral for a consultation. Exs. K at p. 10; L at p. 96. His vitals and routine evaluations likewise show no signs of acute medical decline. During a December 21, 2023 check, staff noted that he does not appear to be in any distress and denies having numerous conditions associated with severe mental or physical decline. Ex. J at p. 1. This type of routine consultation and medical encounter appear literally dozens of times throughout Defendant's medical records from 2023-25, indicating a superior level of access to medical support. See generally Exs. J, K, L (2023-25 medical records).

Taken together, the records across all years show:

- Independent ambulation
- Ability to maintain his own living space
- Appropriate communication and normal cognition
- Medication enabling daily functioning
- Regular specialist appointments (e.g. GI and neurosurgery)
- Stable vital signs and notations of no acute distress
- Routine chronic-care follow-up and post-surgical recovery

12

1      Nothing in these records shows functioning decline, inability to

2   care for himself, or any circumstance that remotely approaches the

3   extraordinary threshold under § 1B1.13(b)(1).

4      Aging and physical deterioration are universal, not

5   extraordinary. Every older inmate experiences chronic pain,

6   stiffness, and reduced mobility. If these common effects of age met

7   the standard, compassionate release would become an automatic pathway

8   for any long-serving prisoner. This is decidedly not the law.

9      And this Defendant is now a low-risk elderly inmate with a

10  nonviolent history. He is serving multiple life sentences for

11  racially motivated murders committed inside a federal penitentiary.

12  Nothing in the medical record or statute transforms ordinary age-

13  related decline into an extraordinary circumstance justifying release

14  for this Defendant.

15     In short, his BOP records show stable functioning and active

16  treatment across three years of documentation. His conditions are

17  ordinary, heavily managed, and nowhere close to the level required by

18  U.S.S.G. § 1B1.13(b)(1).

19          3.   Defendant has not come close to showing a diminished
                 ability to self-care
20

21     Section 1B1.13(b)(1) requires a serious functional breakdown—a

22  condition that prevents an inmate from performing basic tasks in

23  custody. Courts repeatedly stress that this standard is narrow and

24  does not include pain, limitations, or the predictable effects of

25  ageing. See United States v. Weidenhamer, 2019 WL 6050264, at *4-5

26  (D. Ariz. Nov. 8, 2019) (self-care means the ability to attend to

27  daily needs, not whether incarceration has become harder); United

28  States v. Ayon-Nunez, 2020 WL 704785, at *2-3 (E.D. Cal. Feb. 12,

13

2020) (ordinary aging and medical decline are not extraordinary and compelling).

As cited in the previous section, Defendant does not identify a single task that he cannot perform. He does not claim that he is unable to walk, bathe, dress, communicate, take medication, or maintain his living space. He does not cite any provider stating that he needs assistance with daily activities. Courts routinely deny motions where, as here, a defendant remains fully capable of managing daily life. See, e.g., United States v. Willis, 2021 WL 2179256, at *4 (D. Or. May 27, 2021).

Put simply, nothing in Defendant's motion shows that he is unable to care for himself in custody. And absent that showing, § 1B1.13(b)(1) is not satisfied—regardless of age, discomfort, or chronic conditions of age.

## C. Defendant Does not Qualify Under the Elderly-Inmate Provision of § 1B1.13(b)(2)

Defendant also invokes the elderly inmate guideline, but § 1B1.13(b)(2) requires more than age and normal chronic health conditions. It requires seriously deterioration in physical or mental health because of aging. Nothing in the record demonstrates such deterioration, and the BOP's own multi-year assessments show the exact opposite. See Ex. F (BOP Report PP37 FSA – First Step Act Needs Assessment History).

The medical summary outlined above attest significantly to the futility of this request. Under the First Step Act's ("FSA") needs-assessment system, Defendant was repeatedly evaluated between 2021-25. Across these assessments, which appear dozens of times in his file, BOP consistently recorded that Defendant had no cognitions

14

1  issues, no mental health needs, no educational needs, and was capable

2  of conducting inmate work requirements and completing educational

3  programming.

4



**Sample Extract from BOP Needs Assessment from October of 2025, Ex. F**

These findings, made by BOP professionals over a five-year

period, show that Defendant has no documented cognitive decline, no

mental health deterioration, and remains capable of work and

educational programming. In other words, the very metrics BOP uses to

assess age-related decline show that he is functioning normally for

someone in custody.

This record cannot be squared with the guidelines' requirement

of "serious deterioration." Courts consistently hold that chronic

pain, mobility limits, and the ordinary effects of aging do not

qualify. See, e.g., United States v. Esparza, 2020 WL 4805055, at *3

15

(C.D. Cal. 2020). BOP's own determinations here confirm the point: Defendant is aging, but he is not experiencing anywhere near the type of decline the elderly-inmate provision covers.

BOP's administrative decision reached the same conclusion, as previously referenced in its September 18, 2024 RIS review, where medical staff found that he met none of the elderly criteria. Ex. A.

Aging alone does not entitle an inmate, much less one serving multiple life sentences for murders committed in custody, to compassionate release. Defendant has shown no age-related deterioration, and BOP's sustained evaluations show that he has none.

### D. Generalized Policy Critiques of BOP Do Not Constitute "Extraordinary and Compelling" Reasons

Defendant also gestures at broad complaints about BOP medical care and prison operations. Mot. at 4. But generalized policy critiques—whether about staffing, treatment models, resource allocation, or systemic challenges—are not extraordinary and compelling reasons under § 3582(c)(1)(A). Courts require an individualized showing that this Defendant faces unique and exceptional circumstances, not a broad indictment of the prison system.

The Ninth Circuit has made itself clear that compassionate release cannot rest of speculative or generalized concerns untethered to an inmate's personal condition. Wright, 46 F.4th at 945 (the question is whether circumstances are extraordinary and compelling as to the defendant). Policy-oriented arguments, by definition, fail that test.

District courts applying Wright routinely reject motions that rely on systemwide or philosophical critiques rather than individual

16

circumstances. For example, courts deny claims that are premised on BOP resource claimed shortages, medical staffing concerns, or institutional delays unless a defendant demonstrates an individualized concrete inability to receive necessary care. <u>See generally</u> <u>Dillon v. United States</u>, 560 U.S. 817, 827 (2010) (requiring factors that are warranted under the particular circumstances of the case).

These cases reflect a simple principle: policy commentary does not equate to personal extraordinary circumstances. If it did, the compassionate release statute would become a vehicle for wholesale judicial reevaluation of prison administration—something Congress plainly did not authorize.

Moreover, Defendant's policy arguments are especially unpersuasive here, where the record forcefully shows that BOP provided him with sustained treatment, specialty referrals, diagnostic imaging, chronic-care monitoring, and medication management over several years. Complaints about the system at large cannot override the concrete evidence of consistent, individualized care in his own file.

In sum, both critiques of BOP practices fail both legally and factually. They do not establish extraordinary or compelling reasons for release, and they cannot justify the reduction of a life sentence for a defendant who committed such reprehensible crimes while already incarcerated.

### E.    The § 3553(a) Factors Weigh Strongly Against Release

Even if Defendant could satisfy exhaustion and an extraordinary and compelling reason—and he cannot—the Court would still have to deny relief because the § 3553(a) factors bar relief. <u>See</u> <u>Keller</u>, 2

17

F.4th at 1284 (A district court that properly denies compassionate release based on the § 3553(a) factors need not determine whether the defendant has shown extraordinary and compelling reasons.). The factors are not close. They all cut sharply against release. The crimes here were among the most serious offenses in the federal system, committed with racial animus, inside a federal penitentiary, by a defendant with a decades-long history of violence. Three life sentences were imposed because nothing less could adequately punish or deter Defendant's conduct or protect the public. None of that has changed.

1.    <u>The Nature and Circumstances of the Offense Are as Serious as Federal Crimes Come</u>

Defendant committed multiple racially motivated murders in a federal prison. The jury convicted him of VICAR murder for killing Frank Joyner and Abdul Salaam, and attempted murder of Byron Ball, all carried out as part of a prison conspiracy to murder black inmates. <u>See</u> <u>generally</u> <u>United States v. Houston</u>, 648 F.3d 806 (9th Cir. 2011).

These were not spontaneous acts. They were coordinated executions carried out in a controlled environment—with the explicit aim of terrorizing and eliminating fellow inmates based on race. These are the exact crimes Congress had in mind when it authorized life sentences for racketeering murder. Moreover, the conduct occurred while defendant was already serving lengthy federal sentences, meaning that incarceration did not restrain him; it merely changed his pool of potential victims. Murders committed in custody represent the highest level of danger and should weigh decisively against compassionate release. And, here, the conduct was not

isolated: there were multiple victims, each separately targeted, murdered or attacked. The sentencing memorandum originally filed in this matter correctly emphasized that these were distinct crimes against distinct victims, warranting multiple life sentences. Dkt. 5649 (Gov't Sentencing Memorandum) at p. 4.

A life sentence for one murder was insufficient. These crimes were so grave that nothing short of multiple life sentences could even begin to address the harm that Defendant visited upon other inmates. No intervening event, no health development, and no aging argument reduces, or even addresses, the gravity of these crimes and the extraordinary risk they demonstrate.

2.   Defendant's History and Characteristics Demonstrate Enduring Danger, Even at An Advanced Age

Defendant's age does not meaningfully reduce the danger he poses. His background demonstrates a persistent willingness and ability to engage in violence that does not depend on physical strength, but rather on ideology, coordination, and the ability to influence—capacities he still possesses.

Defendant's criminal trajectory speaks for itself. Long before the VICAR murders, he already amassed a record of extreme violence. He was serving 25 years for armed bank robbery, followed by a consecutive seven-year term for assault resulting to bodily injury to another inmate—an attack serious enough that the sentencing court imposed that sentence consecutively. Dkt. 5649 at pp. 2-3. This is not a defendant whose violence was circumstantial or youthful; it has been the defining theme of his adult life, both in the community and while in federal custody.

The murders in this case underscore why age offers no meaningful
mitigation. Defendant participated in a planned conspiracy to murder
black inmates, resulting in the VICAR murders of Frank Joyner and
Abdul Salaam and the attempted murder of Byron Ball. These were
coordinated, racially targeted killings carried out while in federal
custody, not impulsive strikes from a position of physical dominance.

Such organized violence depends on worldview, allegiance, and
willingness—not youth. A person who can identify targets, coordinate
actions, and participate in racially motivated conspiracy does not
suddenly become safe because he has advanced to his seventies.

Nothing in Defendant's currently functioning suggests any
erosion of those traits. BOP's multi-year FSA assessments uniformly
record no cognitive decline, mental deterioration, and no deficits in
judgment or communication. Ex. F. He remains capable of work,
education, and normal institutional functioning. Id. These findings
confirm that the capacities that enabled his past violence—the
ability to understand, plan, communicate, and cooperate—remain
completely intact.

For these reasons, the Court cannot reasonably conclude that
Defendant's age neutralizes the danger he has repeatedly shown he is
able to inflict—directly or indirectly.

3.    Deterrence and Respect for the Law

The racketeering conspiracy in this case involved a violent
prison whose influence extended well beyond Defendant. General
deterrence is particularly critical in gang cases, where the
perception of leniency can undermine the law's authority. Cutting
Defendant's sentence for reasons that are not extraordinary would
send the wrong message to similarly situated defendants. See United

States v. Ebbers, 432 F. Supp. 3d 421, 432 (S.D.N.Y. 2020) (general
deterrence is a "critical consideration" under § 3553(a) in
compassionate release cases).

   Defendant's crimes demand a sentence that continues to promote
respect of the law and deter similar conduct. The sentencing court
specifically emphasized the necessity of deterrence and respect for
the law when it imposed the term of multiple life sentences. Dkt.
5918. Those sentences were designed not only to punish this Defendant
but to send a message to the inmate population and the public:
racially targeted murders while in custody will be met with the most
severe custody sanctions the federal system allow. Reducing those
sentences now would undermine that message entirely.

   Federal prisons are closed environments with fragile hierarchies
and deeply volatile dynamics. In that setting, general deterrence
matters more, not less. When inmates see that deliberate, racially
motivated killings can later be overwritten with compassionate
release, the system loses its ability to deter the exact type of
organized, ideologically driven violence that this Defendant helped
carry out.

   In short, the interests of deterrence and respect for the law
are not just present here—they are at their peak. Nothing in
Defendant's motion suggests that these interests have been satisfied
or could be met by anything less than the life sentences originally
imposed.

        4.   Continued Incarceration is Necessary to Protect the
             Public

   Section 3553(a)(2)(C) requires the Court to consider whether the
public can be protected if this Defendant is not confined. The answer

21

remains clear. Defendant's danger has never depended on physical strength; it has stemmed from ideology, coordination, and a demonstrated willingness to act within the prison environment. Those are capacities that age does not meaningfully diminish. Defendant committed the VICAR murders while already serving lengthy federal sentences for crimes of violence, after decades in custody. His crimes were purposeful and collective, carried out as part of a conspiracy to murder black inmates. This is precisely the type of offender for whom courts find that confinement does not neutralize risk: if a defendant can plan and execute multiple murders from within prison, the simple fact of being restricted or supervised does not render the public safe from him.

Nothing in the current record indicates that the foundations of his past violence—his judgment, perspective, and ability to interact and influence others in a custodial setting—have changed. To the contrary, BOP's multi-year assessments reflect that he remains fully oriented, cognitively intact, and capable of normal functioning.

Defendant's post-conviction disciplinary record is not without violations. Ex. C (BOP Report PD15 – Defendant's Chronological Disciplinary Record). Although his disciplinary violations in the past 15 years are not severe, they are noteworthy for their nature, not their gravity. Incidents involving gang-related communication in May of 2015 and contraband in September of the same year involving the acquisition of non-personal-use quantities of stamps demonstrate that he continued to engage in conduct that depends on communication, association, and planning within a Supermax custodial environment. Id. While they do not establish violent behavior, they do show that

1  Defendant's institutional profile remained active, rather than
2  withdrawn or disengaged.

3      Age does not eliminate the risk of prisoners whose violence is
4  organized and ideological, even if their capacity to carry out
5  violence personally is diminished. Defendant's history places him
6  squarely in that category. Public safety—including the safety of
7  inmates, correctional staff, and the community—continues to require
8  his lifelong confinement.

9          5.    Reducing This Sentence Would Create a Disparity that
                No Court Has Ever Endorsed
10

11     Section 3553(a)(6) requires the Court to avoid unwarranted
12  disparities. In cases involving VICAR murders committed in custody,
13  the national sentencing norm is clear and consistent: life
14  imprisonment, often imposed consecutively. This is what the
15  sentencing court did here when it ordered multiple life sentences.
16  There is no record, within this Circuit or otherwise, of
17  compassionate release being granted to an inmate who committed even
18  one homicide in custody, let alone two murders and an attempted
19  murder arising from a targeted conspiracy. Cutting this sentence to a
20  time-served would place Defendant in a category entirely of his own,
21  with no comparable precedent.

22     It would also invert proportionality. Defendants serving life
23  for single-victim murders, non-racist killings, or community-based
24  offenses routinely remain incarcerated. Allowing release here—where
25  conduct was more aggravated, more deliberate, and committed inside a
26  prison—would create a hierarchy of sentencing outcomes that runs
27  counter to federal practice and common sense.

28

The sentencing disparity is not abstract. It would signal that the most serious in-custody murders are negotiable, whereas less aggravated offenders continue to serve their sentences in full. Nothing in § 3553(a)(6) supports such an outcome.

### 6.   The § 3553(a) Factors End the Inquiry

The § 3553(a) factors leave no room for relief. This Defendant is not someone who made a mistake, aged out of risk, or presents a sympathetic arc. He is a man who committed multiple racially motivated murders inside a federal prison while already serving decades for violent crimes. The sentencing court imposed multiple life sentences because his conduct was exceptional in its severity and his danger was exceptional in its persistence. None of that has changed. Age does not necessarily alter judgment, ideology, or willingness to operate in a custodial environment. Reducing his sentence would reward the very offender for whom compassionate release was never intended.

## V.   CONCLUSION

Defendant's motion fails at every step. There is no "extraordinary and compelling" circumstance in this case. Defendant's age and routine medical conditions do not outweigh the reality of his record: multiple racially motivated murders while already serving long federal sentences.

The § 3553(a) factors close the door entirely. The seriousness of the offenses, the need for deterrence, the necessity of protecting the public, and the propriety of the original sentence remain unchanged. Nothing in Defendant's motion alters those considerations.

This is simply not the kind of case for which compassionate release was designed. The motion should be denied.

24

1

## <u>DECLARATION OF JOHNPAUL LECEDRE</u>

2    I, JohnPaul LeCedre, declare as follows:

3        1.   I am an Assistant United States Attorney in the United

4    States Attorney's Office for the Central District of California. I

5    represent the government in the above-entitled matter.

6        2.   On October 7 and 8, 2025, I received numerous records by

7    electronic mail from Bureau of Prisons ("BOP") Legal Assistant Joseph

8    Cruz whom I know to be an employee and custodian of record for BOP.

9    He provided the following documents:

10            a. <u>Exhibit A</u>, attached herein, a true and correct copy of

11               Defendant Wayne Bridgwater's ("Defendant") Reduction in

12               Sentence Eligibility Review, dated September 18, 2024

13            b. <u>Exhibit B</u>, attached herein, a true and correct copy of

14               the Response letter authored by Warden J. Wadas denying

15               Defendant's request for a reduction in sentence;

16            c. <u>Exhibit C</u>, attached herein, BOP PD15 Report, a true and

17               correct copy of Defendant's Chronological Disciplinary

18               Record, dated October 7, 2025;

19            d. <u>Exhibit D</u>, attached herein, BOP PD37 ARS Report, a true

20               and correct copy of Defendant's Facility Designation

21               History, dated October 7, 2025;

22            e. <u>Exhibit E</u>, attached herein, BOP PD37 CAR Report, a true

23               and correct copy of Defendant's Inmate Care Level

24               Designation, dated October 7, 2025;

25            f. <u>Exhibit F</u>, attached herein, BOP PD37 FSA Report, a true

26               and correct copy of Defendant's First Step Act Needs

27               Assessment History, dated October 7, 2025;

28

g. Exhibit G, attached herein, BOP PD37 LEV Report, a true
   and correct copy of Defendant's Security Classification
   History, dated October 7, 2025;

h. Exhibit H, attached herein, BOP PP44 Report, a true and
   correct copy of Defendant's Individual Inmate Profile
   History, dated October 7, 2025;

i. Exhibit I, attached herein, BOP PPPI Report, a true and
   correct copy of Defendant's Public Information Data
   History, dated October 7, 2025;

j. Exhibit J, to be filed under seal, a true and correct
   copy of Defendant's 2023 BOP medical records;

k. Exhibit K, to be filed under seal, a true and correct
   copy of Defendant's 2024 BOP medical records; and

l. Exhibit L, to be filed under seal, a true and correct
   copy of Defendant's 2025 BOP medical records.

I declare under penalty of perjury under the laws of the United
States of America that the foregoing is true and correct and that
this declaration is executed at Los Angeles, California, on November
16, 2025.


                              /s/ JohnPaul LeCedre
                          _____